Entered on Docket
October 10, 2006
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

NOT FOR PUBLICATION

Signed: October 06, 2006

_____
**RANDALL J. NEWSOME**
**U.S. Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re Daniel P. Ferre, | Case No. 04-46162 RN7 |
| Debtor. | Chapter 7 |
| Sara Kistler, Acting United States Trustee, | |
| Plaintiff, | |
| v. | Adv. Pro. 05-4317 AN |
| Daniel P. Ferre, | |
| Defendant. | |

### FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

This matter is before the Court pursuant to an adversary proceeding filed by the United States Trustee (the "UST") to determine whether Daniel P. Ferre (herein the "Debtor") should be denied a bankruptcy discharge. In accordance with Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052,[1] upon consideration of the record in this case and the testimony, evidence, and pleadings submitted to the Court at a June 5, 2006 trial, the Court hereby submits the following findings of fact, opinion and conclusions of law.

### FINDINGS OF FACT

**1.** From 1980 until 1994, the Debtor and his father operated Diablo Transportation, a trucking company. The Debtor served as vice president and president of Diablo Transportation, and was

---

[1] Unless otherwise indicated, all section and rule references are to the Bankruptcy Code, 11 U.S.C. sections 101-1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

1 responsible for the running of the company. In 1994, the Debtor and his father sold the company for $2 million. (Trial Transcript ("TR") at 8-9).

**2.** Thereafter, the Debtor created, as settlor, the *Daniel Ferre Revocable Trust Dated November 5, 1995 as Restated on August 5th 1999* (herein the "Revocable Trust"). The Revocable Trust named the Debtor as trustee, and as the sole named beneficiary. (TR at 11; UST Ex. 7).

**3.** In August of 1996, the Debtor married Debbie K. Ferre (herein "Debbie") in Jamaica. (TR at 9, 46).

**4.** On or about January 21, 1997, the Debtor acquired certain adjoining real property located in Walnut Creek, California from his mother: an unimproved lot located at 747 Castlerock Road, and what became the marital home to the Debtor and Debbie, located at 777 Castlerock Road. (TR at 9, 47-48; UST Ex. 12).

**5.** Pursuant to a *Trust Transfer Deed* dated January 21, 1997, and recorded on April 14, 1998, the Debtor transferred the property located at 747 and 777 Castlerock Road to the Revocable Trust. (UST Ex. 13).

**6.** On or about November 15, 2002, the Debtor and Debbie executed a *Marital Separation-Settlement Agreement* (herein the "Marital Separation Agreement"). (UST Ex. 4; TR at 48).

**7.** In or about February of 2003, the Debtor's father filed a lawsuit against the Debtor entitled *Henry Ferre v. Daniel Ferre*, Case No. C03-00325 in the Superior Court for Contra Costa County alleging, *inter alia*, fraud and elder financial abuse (herein the "Elder Financial Abuse Action"). The Elder Financial Abuse Action was predicated upon the assertion that the Debtor forged his father's signature on certain deeds to real property owned by his father so as to transfer a one-third interest in the same to the Debtor. (TR at 11; UST Ex. 8).

**8.** On or about March 12, 2003, the Debtor caused articles of organization to be filed with the California Secretary of State to form the Diablo Valley Investment Group, LLC (herein "DVI") with Debbie. The articles of organization list the Debtor as the agent for service of process with his address at 777 Castlerock Road, and state the purpose of the DVI as "real estate investment." (TR at 29, 79-81; UST Ex. 22). The *Statement of Information*, filed with the Secretary of State on March

- 2 -

28, 2003, lists the Debtor and Debbie as managers and/or members of DVI. (UST Ex. 21). Shortly thereafter, on or about April 8, 2003, the Debtor and Debbie opened business checking and savings accounts at Wells Fargo Bank in the name of the DVI, giving its address as 777 Castlerock Road and utilizing the Debtor's social security number for taxpayer identification requirements (herein the "DVI Accounts"). The Debtor and Debbie were designated as authorized signatories on the DVI Accounts. (TR at 29, 79; UST Ex. 23; *Statement of Debtor's Social Security Number,* Case 04-46162, Docket Entry # 6). Also on or about April 8, 2003, the Debtor signed the Wells Fargo Bank *Certificate of Authority* as an owner of DVI, for authorization to transact business on the DVI Accounts. (TR at 29-30, 79; UST Ex. 24).

**9.** Thereafter, on or about May 12, 2003, the Debtor and Debbie "as husband & wife" purchased real property located at 7019 North Via De Siesta in Scottsdale, Arizona (the "Arizona Property"), as "joint tenants with rights of survivorship." At this same time, the Debtor and Debbie, again as "husband and wife," borrowed $212,300 from Wells Fargo Home Mortgage, Inc., on a 30-year loan term, pledging the Arizona Property as security (herein the "Wells Fargo Mortgage"). (TR at 27-28, 80, 144-145; UST Exs. 25 and 26).

**10.** On or about July 17, 2003, the Debtor and Debbie co-signed on a $250,000 line of credit at Wells Fargo Bank, secured by the 777 Castlerock Road property (herein the "Line of Credit"). (TR at 32-33, 72-73; UST Ex. 28).

**11.** In or about August of 2003, the Debtor closed escrow on a sale of the unimproved lot at 747 Castlerock Road, for about $550,000. The Debtor gave about one-half of the sale proceeds to Debbie, apparently to comply with the cash payment requirements of the Marital Separation Agreement. (TR at 16, 53-55).

**12.** Sometime in September of 2003, the Debtor sold about $707,000 in mutual funds and notes. (TR at 56-57).

**13.** A trial of the Elder Financial Abuse Action began on September 5, 2003. (TR at 11).

**14.** Three days later, on September 8, 2003, upon the advice of attorney Scott Zimmerman ("Zimmerman") and at the request of the Debtor and Debbie:

**A)** Articles of organization were filed with the California Secretary of State to form the DDF Group, LLC, (herein the "DDF Group"). Debbie was named as the DDF Group managing member. (TR 84-85; UST Exs. 31 and 32);

**B)** A certificate of limited partnership was filed with the California Secretary of State to form the DDF Family Limited Partnership (herein the "Family Partnership"). The Debtor held a 1% interest in the Family Partnership, Debbie held a 78% interest, Debbie's two daughters each held a 10% interest, and the DDF Group held a 1% interest. An entity named "The DDF, LLC," located at 777 Castlerock Road, was designated as the general partner of the Family Partnership. (TR 102-104; UST Exs. 16 and 17);[2]

**C)** A quit claim deed was recorded whereby the Debtor transferred the property at 777 Castlerock Road from the Revocable Trust to himself and Debbie, as joint tenants. (TR at 11-12; UST Ex. 14); and

**D)** A quit claim deed was recorded whereby the Debtor and Debbie transferred the property at 777 Castlerock Road from themselves as joint tenants, to the Family Partnership. (TR at 13, 14; Ex. 15).

**15.** On September 12, 2003, a jury in the Elder Financial Abuse Action found the Debtor liable for fraud and the financial abuse of his father. The jury awarded the Debtor's father $925,000 in damages. A judgment in the Elder Financial Abuse Action was entered on September 15, 2003, and subsequently was amended to include attorneys' fees and costs, bringing the total judgment to approximately $1.168 million. (TR at 14; UST Exs. 9 and 10).

**16.** On or about September 23, 2003, Debbie filed a *Petition for Legal Separation* in the Contra Costa County Superior Court, declaring under penalty of perjury that the actual date of marital separation between her and the Debtor was May 21, 2003. (UST Ex. 5).

---

[2] The actual identity of the general partner is unclear. The initial paragraph to the *Certificate of Limited Partnership* designates "The DDF Group, LLC" as the general partner. Thereafter, paragraph 5 of that same document refers to the general partner as "The DDF LLC." (UST Ex. 17).

- 4 -

17.     Between September 16th and 22nd of 2003, the Debtor wrote three checks withdrawing about $673,000 from an account maintained at the Financial Network Investment Corporation. These checks were made payable to the Debtor in his capacity as trustee of the Revocable Trust. The bank routing information imprinted on the face of each cancelled check shows that these funds were deposited into Wells Fargo Bank checking account number 0175613850. The Debtor testified that although "the [Revocable] Trust name was probably on" account number 0175613850, the Debtor used it as "my checking account." Thereafter, the Debtor gave Debbie $400,000 of these funds, apparently to comply with the Marital Separation Agreement, leaving a balance of about $273,000. (TR at 14-15, 78-79, 108; UST Exs. 18, 19 and 20).

18.     On or about September 17, 2003, the Debtor obtained four Wells Fargo Bank cashier's checks for $25,000 each, drawn on funds in account number 0175613850 and made payable to himself. Additionally, on or about September 23, 2003, the Debtor obtained another Wells Fargo Bank cashier's check in the amount of $45,000, again drawn on account number 0175613850 but made payable to the Bellagio hotel and casino in Las Vegas, Nevada. (UST Ex. 37)

19.     On or about September 22, 2003, the Debtor deposited two cashier's checks, totaling $50,000, into his account at the Bellagio. The face of the corresponding Bellagio customer deposit receipt notes the Debtor's Bellagio account number and "2 x 25k C/Check." The back of the deposit receipt bears the Bellagio date and time stamp. The following morning the Debtor twice made a $25,000 "Front Money Deposit" via a cashier check, to the casino marker bank he believed to be at Caesar's Palace, but may have been at another gaming establishment in Las Vegas.[3] Later, on September 24, 2003, the Debtor deposited the $45,000 cashier's check into his Bellagio account. Thereafter, pursuant to a "Check on Board" receipt dated September 25, 2003, the Debtor deposited a $50,000 Wells Fargo issued check into his account at Caesar's Palace. The Debtor's Caesar's Palace account number appears on the face of the "Check on Board" receipt. (TR at 147-150; UST Ex. 37).

---

[3] The corresponding "Front Money Bank" checks used to withdraw funds from this account bear the winged lion and "V" shield insignia of the Venetian hotel and casino, also in Las Vegas. (UST Ex. 37).

- 5 -

20. Between November 28, 2003 and September 16, 2004, on 11 separate occasions, the Debtor charged lodging at various hotel and gambling establishments in Nevada to his American Express Platinum Card account, including Caesar's Palace, the Bellagio, Harvey's, the Mandalay Bay and Harrah's. (UST Ex. 36).

21. Between October 16, 2003 and November 28, 2003, the Debtor signed 14 checks, in denominations ranging from $2,000 to $5,000 and totaling $45,000, drawn on his Caesar's Palace account. The Debtor's Caesar's Palace account number appears on the corresponding check stubs. Of this amount, $17,000 in withdrawals occurred between November 25th to 28th of 2003. (UST Ex. 37). The Debtor was in Las Vegas during this period for the Thanksgiving holiday. (TR at 74).

22. On or about December 8, 2003, the Debtor transferred his interest in the Arizona Property via a quit claim deed to Debbie in exchange for $10. (TR at 28, 145; UST Ex. 27). Thereafter, Debbie transferred title to the Arizona Property into the name of DVI. (TR at 141, 144-145; UST Ex. 3, Debtor Ex. A, *Amended Sch. F*).

23. As of November 20, 2003, the outstanding loan balance owed on the Line of Credit was approximately $142,499. Between December 11, 2003 and January 12, 2004, five advance draws totaling $107,000 were made from the Line of Credit. Of that amount, $50,000 was transferred to Steve G. Russo, Debbie's brother, allegedly in repayment for funds she had previously borrowed from him. These five draws took the total advances on the Line of Credit to the pre-set $250,000 credit limit. (TR at 32-33, 72-73; UST Ex. 28).

24. Thereafter, on or about February 20, 2004, pursuant to an *Addendum to Certificate of Authority*, the Debtor was removed as a signatory on the DVI Accounts. (TR at 30; Ex. 24).

25. Between August 17, 2004 and October 14, 2004, the Debtor paid his attorney, Zimmerman, about $65,000, via the Debtor's American Express Platinum Card account. (TR at 31-32, 60- 61; UST Ex. 36).

26. On or about November 10, 2004, the Debtor sold his 1% interest in the Family Partnership to Debbie for $10,000, for which Debbie wrote him a check. (TR at 22-23; UST Exs. 29 and 30).

27. On November 16, 2004, the Debtor voluntarily filed a petition under Chapter 11 of the

- 6 -

Bankruptcy Code. (UST Ex. 1). Thereafter, on December 1, 2004, the Debtor filed his bankruptcy Schedules A through J, and his the Statement of Financial Affairs, which he signed under penalty of perjury. (UST Ex. 2). Pursuant to a stipulation between the Debtor and his father, who had objected to this case continuing under Chapter 11 with the Debtor in possession, on January 18, 2005, this bankruptcy case was converted to one under Chapter 7 of the Code. (*Order Converting Case 04-46162*, Docket Entry # 53).

**28.** Following a meeting of creditors at which the Debtor was questioned under oath, and an investigation by the Chapter 7 trustee, it was discovered that various items were not disclosed on the Debtor's bankruptcy Schedules and on the Statement of Financial Affairs. (TR at 113- 116). On April 7, 2005, the Debtor filed amended bankruptcy Schedules and an Amended Statement of Financial Affairs, which he again signed under penalty of perjury, disclosing some items not disclosed on his original Schedules and Statement of Financial Affairs. (UST Ex. 3; Debtor Ex. A).

**29.** On July 18, 2005, the UST filed the instant adversary proceeding complaint asserting a cause of action pursuant to §727(a)(4)(A) to deny entry of a discharge in this bankruptcy case. At trial, the UST alleged that the Debtor knowing, fraudulently and intentionally made a false oath when he failed to disclose on his original and/or amended Schedules and Statement of Financial Affairs:

    **A)**     The correct income from the sale of 747 Castlerock Road, and the income received from the sale of the mutual funds and notes;

    **B)**     The Debtor's legal or equitable interest in 747 and 777 Castlerock Road;

    **C)**     The transfers of the Family Partnership interest, the Arizona Property, and to Zimmerman;

    **D)**     The gambling losses and the Revocable Trust;

    **E)**     The Debtor's interest in DVI and the DVI Accounts, and his repayment obligations on the Line of Credit and the Wells Fargo Mortgage;

    **F)**     Approximately $6,000 of the funds received from Debbie's purchase of the Family Partnership interest;

    **G)**     Debbie as his co-debtor on the Wells Fargo Mortgage and the Line of Credit; and

    **H)**     The Elder Financial Abuse judgment. (TR at 150-153; *Complaint*, 05-

4317AN, Docket Entry # 1).[4]

**OPINION**

**I.   Denial of Discharge Pursuant to §727(a)(4)(A)**

Section §727(a)(4)(A) provides that a debtor shall not be granted a discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." Denial of a discharge pursuant to §727(a)(4)(A) requires proof by a preponderance of the evidence of **1)** a false statement under oath or penalty of perjury; **2)** made knowingly and fraudulently; and **3)** regarding a material fact. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (9th Cir. BAP 2004). A plaintiff seeking denial of a debtor's bankruptcy discharge pursuant to §727(a)(4)(A) bears the initial burden of proof. Once it reasonably appears that the oath is false, the burden shifts to the debtor to disprove the allegation. *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149, 151 (Bankr. D. Mont. 1998). An actionable false oath may involve an affirmatively false statement or an omission from the debtor's schedules. *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999).[5] A false oath is complete when made. *In re Searles*, 317 B.R. at 377; *Sholdra v. Chilmark Financial LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001); *cert. denied*, 534 U.S. 1042 (2001).

The purpose of §727(a)(4)(A) is to provide the trustee and creditors with accurate and dependable information that they can rely on without needing to conduct costly investigations. *In re Wills*, 243 B.R. at 63. A debtor is required to provide full disclosure of all material information, *i.e.,* information that aids in understanding the debtor's financial affairs and transactions. *Clark v. Hammeken (In re Hammeken)*, 316 B.R. 723, 734 (Bankr. D. Ariz. 2004); *Stanley v. Hoblitzell (In*

---

[4] The Elder Financial Abuse judgment should have been disclosed in response to question 4 on the original Statement of Financial Affairs. It was not. The original Schedule F, however, lists as disputed the $1 million plus debt underlying the Elder Financial Abuse judgment held by the Debtor's father. (UST Ex. 2).

[5] A debtor's bankruptcy schedules must be verified or contain an unsworn declaration under penalty of perjury. 28 U.S.C. §1746; Fed. R. Bankr. P. 1008. Accordingly, a false statement or omission in a debtor's schedules or statement of financial affairs qualifies as a "false oath" within the meaning of §727(a)(4)(A). *Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 502-503 (Bankr. E.D. Cal. 2001).

- 8 -

*re Hoblitzell)*, 223 B.R. 211, 215 (Bankr. E.D. Cal. 1998) (not for debtor to decide which assets to disclose; all assets must be scheduled so those interested in the case have accurate information). For purposes of §727(a)(4)(A), materiality is broadly defined. A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. A false statement or omission may be material even if it does not cause direct financial prejudice to creditors. *In re Wills,* 243 B.R. at 62-63. Moreover, an omission or misstatement relating to an asset that is of little value, or that would not be property of the estate, is material if the omission or misstatement detrimentally affects administration of the estate. *Ford v. Ford (In re Ford)*, 159 B.R. 590, 593 (Bankr. D. Or. 1993). A discharge may be denied if such an omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition. *In re Wills,* 243 B.R. at 63; *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 14 (Bankr. D. Idaho 1999) (materiality concerns relation of false oath to debtor's financial affairs or bankruptcy process, not asset value).

To deny a discharge pursuant to §727(a)(4)(A), the plaintiff must show that the debtor knowingly and fraudulently made a false oath. *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990). The debtor's actual fraudulent intent may be established by circumstantial evidence or by inferences drawn from his or her course of conduct. *Devers v. Bank of Sheridan (In re Devers),* 759 F.2d 751, 753-754 (9th Cir.1985); *In re Wills,* 243 B.R. at 64. The court may find the required intent from the surrounding circumstances and certain "badges of fraud," not all of which need to be present, including **1)** a close relationship between the transferor and the transferee; **2)** that the transfer was in anticipation of a pending suit; **3)** that the transferor debtor was insolvent or in poor financial condition at the time; **4)** that all or substantially all of the debtor's property was transferred; **5)** that the transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and **6)** that the debtor received inadequate consideration for the transfer. *Emmett Valley Associates v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518-519 (9th Cir. 1992); *In re Wills,* 243 B.R. at 64. A single false oath may be

- 9 -

sufficient to warrant denial of a discharge, although the court may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth. *In re Wills,* 243 B.R. at 64; *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr S.D. Cal. 1996).

### A. The Arizona Property, DVI, the DVI Accounts and the Wells Fargo Mortgage

Question number 10 to the Statement of Financial Affairs requires disclosure of property transfers by the debtor made within one year of the filing of his bankruptcy case. Bankruptcy Schedule B, at line item 12, mandates disclosure of a debtor's stock and other interests in incorporated and unincorporated businesses. The Statement of Financial Affairs, at question number 11, requires disclosure of all financial accounts held in the debtor's name that were closed or otherwise transferred within one year of the filing of the debtor's bankruptcy case. A debtor is required to disclose secured debts he is obligated to pay on Schedule D, and non-priority unsecured debts he is obligated to pay on Schedule F.

Here, the Debtor did not disclose on his original Statement of Financial Affairs that within one year of filing this case, on December 8, 2003, he transferred his interest in the Arizona Property to Debbie in exchange for $10, or that as of February 20, 2004, he was no longer a signatory on the DVI Accounts, having transferred signatory control solely to Debbie. Additionally, the Debtor did not disclose on his original bankruptcy schedules his interest in DVI or that he was obligated to pay on the Wells Fargo Mortgage, which was secured by the Arizona Property. Each of these omissions constitutes a false oath.[6]

Moreover, within one year of the filing of this bankruptcy case, title to the Arizona Property went from being held by the Debtor and Debbie as husband and wife to just Debbie, who then transferred it to DVI. Rent collected from tenants leasing the Arizona Property went to DVI. (TR at 80, 141, 144-145). As such, each of the above omissions is material since they effectively hid the

---

[6] Even after these omissions were discovered, the Debtor's Amended Schedules and Amended Statement of Financial Affairs did not disclose his interest in DVI, or that he was no longer a signatory on the DVI Accounts. *In re Searles*, 317 B.R. at 378 (debtor has continuing duty to amend schedules for accuracy).

- 10 -

Debtor's pre-bankruptcy transfers and dispositions of undisclosed assets, and impeded the Chapter 7 trustee's post-bankruptcy discovery and administration of such assets. This was particularly true of the Arizona Property, which the trustee initially "did not know anything about." (TR at 115-116). Disclosure of any one of these omissions would have led or at least pointed to the discovery of the others.

The overwhelming weight of the evidence establishes that these omissions were made knowingly and fraudulently. The transfer of the Arizona Property obviously involved "a close relationship" as it was between the Debtor and Debbie. As of December 8, 2003, the Debtor's financial condition was deteriorating. Pursuant to the Marital Separation Agreement, the Debtor was obligated to pay Debbie $200,000 in spousal support, transfer the marital home at 777 Castlerock Road to the Family Partnership, and pay Debbie an additional $500,000 by no "later than December 31, 2003." (UST Exs. 4 and 5).[7] By early December 2003, not only had the Elder Financial Abuse judgment already been entered against the Debtor, his father was just days away from filing another Superior Court lawsuit against him, entitled *Henry Ferre v. Daniel Ferre*, Case No. 03-03054, to recover alleged fraudulent transfers. (Debtor Ex. A, UST Ex. 3, *Amended Statement of Financial Affairs,* at Question 4; *Request for Judicial Notice Filed by Scott Zimmerman*, Case No. 04-46162, Docket Entry # 79). Finally, the Debtor received only $10 in exchange for his interest in the Arizona Property. Accordingly, the Court finds that the omissions of DVI, the DVI Accounts, the Wells Fargo Mortgage and the transfer of the Arizona Property meet the elements of §727(a)(4)(A).

In response, the Debtor testified that he didn't disclose the Arizona Property, the Wells Fargo Mortgage, DVI and the DVI Accounts because he didn't have an interest in any of these, only Debbie did. The alleged extent of his involvement was limited to co-signing on the Wells Fargo Mortgage to purchase the Arizona Property, purportedly because Debbie did not have good credit

---

[7] In alleged compliance with the Marital Separation Agreement, in August of 2003 the Debtor paid Debbie about $250,000 which he obtained from the sale proceeds of the unimproved lot at 747 Castlerock Road, and in September of 2003 he paid Debbie $400,000 from funds withdrawn from the Financial Network Investment Corporation account. This would leave a balance of about $100,000 owed to Debbie and due by December 31, 2003. (TR at 16, 53-55, 78).

- 11 -

to do so on her own. His transfer of the Arizona Property for $10 allegedly was just to take "my name off the title." DVI was solely Debbie's "little real estate thing." (TR at 27-28, 31, 68-70). The overwhelming weight of the evidence presented, however, is wholly contrary to the Debtor's asserted "limited involvement." Furthermore, in considering and observing the Debtor and his testimony, and questioning him during the course of the trial, the Court finds the Debtor's testimony totally lacking in credibility.[8]

Both the articles of organization and the *Statement of Information* filed to form DVI name the Debtor as the agent for service of process and as a member and/or manager of the company.[9] The Debtor's social security number, not Debbie's, was provided to open the DVI Accounts, on which the Debtor was made an authorized signatory. In opening the DVI Accounts the Debtor signed the Wells Fargo Bank *Certificate of Authority* as an owner of DVI. On about May 12, 2003, about a week before their actual date of marital separation, the Debtor and Debbie purchased the Arizona Property "as husband and wife" to hold as joint tenants. Concurrently, again as husband and wife, they took out a $212,300 mortgage on the Arizona Property. (UST Exs. 21-26). Finally, the Debtor is an experienced businessman who has purchased, owned and sold various parcels of real property. The Debtor asserts that it must have been either the escrow company or Wells Fargo Bank that put his name on the title to the Arizona Property and required that he and Debbie hold it as joint tenants. This assertion is not worthy of belief. (TR at 71, 142-145). The documentary

---

[8] On key points, the Debtor's testimony conflicted from his prior accounts. For example, the Debtor testified at trial that he incurred gambling losses of about $150,000 to $160,000 but not within the one year period before he filed this bankruptcy case. (TR at 33-37, 140-141). This testimony conflicts with the Debtor's August 25, 2004 deposition testimony given in connection with the Elder Financial Abuse Action, and introduced at trial for purposes of impeachment, wherein he testified that between September 2003 and January 2004, mostly within the applicable one year period, he incurred gambling losses of about $150,000. (TR at 37-40, 81-82).

Furthermore, at trial the Debtor testified that post-petition, as of November 23, 2004, he was not holding on to any of the money received from Debbie in payment for his 1% interest in the Family Partnership. This conflicts with the Debtor's January 30, 2006 deposition testimony in advance of this adversary proceeding, also introduced at trial for purposes of impeachment, wherein he testified that $6,000 he deposited on November 23, 2004 into his Wells Fargo Bank checking account number 0175613850, came from the $10,000 Debbie paid him for his Family Partnership interest. (TR at 24-27; UST Ex. 35).

[9] When pointedly questioned about whether DVI owned the Arizona Property, the Debtor agreed that it was he who requested the formation of all the various entities here, which would include DVI. (TR at 80-81).

- 12 -

evidence concerning the Arizona Property, including the Wells Fargo Mortgage documents, does not contain any such requirements. Moreover, when questioned why, if Wells Fargo Bank did require the Debtor be placed on the title to the Arizona Property in May of 2003, it would thereafter allow his name to be removed from the title in December of 2003, the Debtor testified that Wells Fargo Bank "didn't know I took it [my name] off [the title]. As far as [Wells Fargo Bank] is concerned I still owe them the money" on the Wells Fargo Mortgage. (TR at 145).

Accordingly, as to the non-disclosure of the Arizona Property, the Wells Fargo Mortgage, DVI and the DVI Accounts, this Court finds that the Debtor knowingly and fraudulently made a false oath.

### B. The Family Partnership and the Line of Credit

In July of 2003, the Debtor and Debbie co-signed on and obtained the Line of Credit, secured by the 777 Castlerock Road property. Between December 11, 2003 and January 12, 2004, five advances totaling $107,000 were made on the Line of Credit, which took the repayment balance to the $250,000 limit. (TR at 32-33, 72-73; UST Ex. 28). During the trial of the Elder Financial Abuse Action, on September 8, 2003, the Debtor and Debbie formed the Family Partnership, in which the Debtor took a 1% interest. Also on September 8, 2003, the Debtor executed and had recorded two quit claim deeds. Pursuant to the first one, the Debtor transferred 777 Castlerock Road from the Revocable Trust to himself and Debbie, as joint tenants. Pursuant to the second quit claim deed, the Debtor and Debbie transferred 777 Castlerock Road from themselves to the Family Partnership. (UST Exs. 14 and 15). On or about November 10, 2004, approximately one week before the Debtor filed this bankruptcy case, he sold his 1% interest in the Family Partnership to Debbie for $10,000. (UST Exs. 29 and 30).

The Debtor's transfer of his interest in the Family Partnership was made well within one year of the filing of his bankruptcy case, and thus disclosure of the transfer was required in response to question number 10 to the original Statement of Financial Affairs. Additionally, as the Debtor was obligated to pay on the Line of Credit, disclosure of that debt was required in his original bankruptcy schedules. Neither was disclosed, and each of these omissions constitutes a false oath. Moreover,

- 13 -

these omissions are material. As with the aforementioned non-disclosures surrounding DVI and the Arizona Property, the omission of the Line of Credit and the transfer of the Family Partnership interest masked a complete picture of the Debtor's assets and liabilities, and the Debtor's pre-bankruptcy dealings. In particular, these omissions obscured transfers of property subject to a possible recovery by the bankruptcy estate, such as 777 Castlerock Road, which as the Debtor testified was the "only thing" in the Family Partnership. (TR at 65).[10]

As with the Arizona Property, the transfer of the Family Partnership interest from the Debtor to Debbie, as well as 777 Castlerock Road (one of the Debtor's "two major assets" acquired during his marriage to Debbie), involved a close relationship.[11] This transfer occurred virtually on the eve of the Debtor filing this bankruptcy case, by which time his financial condition, already deteriorated from payments made pursuant to the Marital Separation Agreement, had worsened as he was unemployed and reporting an income of $0. (UST Ex. 2, *Schedule I*). At this time, the fraudulent conveyance action filed by the Debtor's father in the Superior Court was pending. In that action, his father had already obtained orders to attach the Family Partnership and 777 Castlerock Road. A hearing in the fraudulent conveyance action on his father's motion for summary judgment was scheduled for early December of 2004, and a trial was scheduled for early January of 2005. (TR at 91; UST Exs. 3, *Amended Statement of Financial Affairs,* at Question 4; 4; *Request for Judicial Notice Filed by Scott Zimmerman*, Case No. 04-46162, Docket Entry # 79). Additionally, at this time, when the Debtor consulted Zimmerman about filing this bankruptcy case, he anticipated that he was about to be sued by Wells Fargo. (TR at 94-95). The Court finds that the omissions of the transfer of the Family Partnership interest and the Line of Credit debt meet the elements of §727(a)(4)(A).

As with the Wells Fargo Mortgage, the Debtor testified that he didn't disclose the Line of Credit because he was only a co-signer on it, that "it was Debbie's line of credit," she "made the

---

[10] On August 4, 2005, the Chapter 7 trustee filed a complaint to avoid and recover the transfer of 777 Castlerock Road, and other properties, as fraudulently conveyed. (*Complaint*, Docket Entry # 1, 05-4342AN).

[11] The other major asset so acquired was the unimproved lot at 747 Castlerock Road. (TR at 47).

- 14 -

payments on that" and although "it depends on how you look at it" he "wasn't obligated to pay it." (TR at 32, 72). Further, the Debtor alleges that he didn't disclose the sale of his Family Partnership interest to Debbie because it was just 1%, and he didn't consider it a transfer. (TR at 66, 136). The Debtor's testimony is not credible, and is contrary to the evidence.

The Debtor consistently testified that it was necessary for him to co-sign on loans with Debbie because her credit was poor. When the Debtor co-signed on the Line of Credit he became obligated to pay it. As an experienced businessman and property purchaser, his testimony on this point is just as unbelievable as the rest of his testimony. Additionally, Melissa DeVay, a paralegal in Zimmerman's office who worked with the Debtor to draft his original Schedules and Statement of Financial Affairs, testified that during the drafting process, when the Debtor had a question about those documents that DeVay could not answer, she would ask Zimmerman. During this time, neither DeVay nor the Debtor consulted Zimmerman as to what constitutes a transfer for purposes of disclosure on a bankruptcy filing. (TR at 105, 112-113). Instead, the Debtor on his own decided the sale of his Family Partnership interest was not a transfer. He didn't ask his lawyer about it and didn't disclose it. This is consistent with the Debtor's pattern of mendacity and evasiveness throughout this case. Accordingly, as to the non-disclosure of the Line of Credit and the Family Partnership, the Court finds that the Debtor knowingly and fraudulently made a false oath. *See, In re Leija*, 270 B.R. at 501; *In re Wills*, 243 B.R. at 64 (requisite intent may be found where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth); *see also*, *In re Hoblitzell*, 223 B.R. at 215 (not for debtor to decide which assets to disclose).[12]

**C.     Income from the Sale of 747 Castlerock Road and the Mutual Funds**

Question number 2 to the Statement of Financial Affairs requires the disclosure of income, other than from employment or operation of a business, received by the debtor within two years of

---

[12] The breadth of the Debtor's non-disclosures is considerable. In addition to the above, the Debtor did not disclose his interest in the Revocable Trust, which should have been disclosed in response question 19 on Schedule B, and did not disclose Debbie on Schedule H as his co-obligor on the Wells Fargo Mortgage and Line of Credit. These non-disclosures further exemplify the Debtor's pattern of falsity and concealment, giving an incomplete picture of his financial condition as to assets and liabilities, particularly concerning the Arizona Property and 747 and 777 Castlerock Road.

- 15 -

his filing for bankruptcy. Here, within the operative two year period, the Debtor sold the unimproved lot at 747 Castlerock Road for about $550,000, and also sold about $707,000 in mutual funds and notes. (TR at 16, 53-57). On his original Statement of Financial Affairs, the Debtor disclosed only about $251,000 from the sale of 747 Castlerock Road, and did not disclose any of the income from the sale of the mutual funds and notes. (UST Ex. 2). These non-disclosures constitute a false oath, and are material as they hid the pre-petition disposition of about $960,000 in assets.

As to the income from the sale of the mutual funds, the Debtor testified that he didn't disclose it because it was a capital gain, and he didn't consider capital gains to be income. (TR at 57). Additionally, the Debtor disclosed only about half of the income he received from the sale of 747 Castlerock Road because he didn't consider the other half of the sale proceeds he gave to Debbie to be *his* income. (TR at 53, 131). The evidence is to the contrary.

Prior to the sale, title to 747 Castlerock Road went from the Debtor's mother to the Debtor, who then transferred it to the Revocable Trust. (UST Exs. 12 and 13). The evidence does not show that Debbie was on the title to 747 Castlerock Road. Moreover, the Marital Separation Agreement did not require that Debbie receive any portion of the sale proceeds from 747 Castlerock Road. That the Debtor used some of those proceeds to pay Debbie amounts he allegedly owed her pursuant to the Marital Separation Agreement did not change the amount of income the Debtor received upon the close of the sale. Again, the Debtor's testimony is not credible.

As to the non-disclosure of the mutual funds, the Debtor's testimony that he didn't consider capital gains to be income is even less credible. A capital gain is derived from the disposition of a capital asset, which may include the sale of real property or securities. 26 U.S.C. §1001, §1221(a). It is not believable that in the context of answering question number 2 to the Statement of Financial Affairs, the Debtor considered his proceeds from the sale of 747 Castlerock Road to be income (albeit in an incorrect amount) but at the same time did not similarly consider the proceeds from the sale of the mutual funds and notes to be income. The Court finds that in not disclosing the income actually received from the sales of 747 Castlerock Road and the mutual funds and notes, the Debtor knowingly and fraudulently made a false oath.

### D. The Transfers to Zimmerman

The Statement of Financial Affairs at question number 3 requires disclosure of all payments, aggregating more than $600, made by the debtor to creditors within 90 days before the filing of his bankruptcy case. Between August 17, 2004 and October 14, 2004, within the applicable 90 day period, the Debtor made about a dozen payments to Zimmerman, totaling about $65,000, which he did not disclose. These payments were made on the Debtor's American Express card account, and were for old legal bills due for Zimmerman's representation of the Debtor during the trial of the Elder Financial Abuse Action and other matters. (TR at 31-32, 59- 61; UST Ex. 36). These omissions constitute a false oath, and are material as they concern the Debtor's pre-petition disposition of property, the discovery and attempted recovery of which caused the expenditure of considerable estate resources. (TR at 119-120).[13]

Moreover, in addition to the Debtor's aforementioned poor financial condition, these transfers also involved a close relationship. Zimmerman represented the Debtor and Debbie concerning various legal matters for a number of years. The Debtor stayed with Zimmerman the evening before his meeting of creditors. (UST Ex. 34). Additionally, in response to question 3 the Debtor disclosed only one payment, that being $7,000 paid to American Express on or about September 12, 2004. (UST Ex. 2).[14] That in November and December of 2004 the Debtor thought to disclose this payment to American Express, but failed to disclose other transfers to American Express that appear on the same invoice further shows his fraudulent intent. (UST Ex. 36). As to the omission of such transfers, the Debtor testified that he asked either DeVay or Zimmerman how to answer question number 3 and "was told to put [answer] nothing." Zimmerman testified that he didn't remember discussing question 3 with DeVay, and because he was recuperating from an illness at home he was not aware of the transfers until he returned to his office. (TR at 60, 96-97). Neither the Debtor's nor Zimmerman's testimony disproves or even reasonably rebuts the false oath. *In re*

---

[13] The Chapter 7 trustee filed a motion to disgorge the payments to Zimmerman, and an adversary proceeding complaint to recover the payments as a preference. (Docket Entries # 65 and 121).

[14] This $7,000 payment was posted as of 9/16/04. (UST Ex. 36).

- 17 -

Case 05-04317    Doc# 26    Filed: 10/06/06    Entered: 10/10/06 16:21:32    Page 17 of 19

*Schmitz*, 224 B.R. at 151 (once false oath is reasonably established, burden shifts to the debtor to disprove). Accordingly, the Court finds that in not disclosing the transfer to Zimmerman, the Debtor knowingly and fraudulently made a false oath.

**CONCLUSIONS OF LAW**

In accordance with the foregoing, pursuant to §727(a)(4)(A), entry of a discharge on behalf of the Debtor in the above-captioned bankruptcy case is hereby denied.

**IT IS SO ORDERED**.

\*\* END OF ORDER\*\*

| | |
|---|---|
| 1 | COURT SERVICE LIST |
| 2 | |
| 3 | Iain A. Macdonald |
| | Law Offices of Macdonald and Assoc. |
| 4 | 2 Embarcadero Center #1670 |
| | San Francisco, CA 94111-3930 |
| 5 | |
| | Office of the U.S. Trustee |
| 6 | 1301 Clay St. #690N |
| | Oakland, CA 94612 |
| 7 | |
| | Paul Mansdorf |
| 8 | 1563 Solano Ave. #703 |
| | Berkeley, CA 94707 |

Case: 05-04317    Doc# 26    Filed: 10/06/06    Entered: 10/10/06 16:21:32    Page 19 of 19